UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ODYSSEY MARINE
EXPLORATION, INC.,

      Plaintiff

v.                                          CASE NO: 8:06-cv-1685-T-23MAP

THE UNIDENTIFIED,
SHIPWRECKED VESSEL, its
apparel, tackle, appurtenances and
cargo located within center point
coordinates 49', 25' N, 6', 00' W;
radius: 5 nautical miles,

      Defendant, *in rem*,

and

THE KINGDOM OF SPAIN,

      Claimant.
_____/

KEITH BRAY,

      Intervening Plaintiff,

v.

ODYSSEY MARINE EXPLORATION,
INC.,

      Defendant.
_____/


## <u>ORDER</u>

      Odyssey Marine Exploration, Inc., an underwater salvage company, six years

ago brought this maritime action against an unidentified wreck located under the

west side of the English Channel off Land's End.  Believing the vessel to be the

*Merchant Royal*, a British ship that foundered in 1641 while transporting a cargo

purportedly worth $500 million, Keith Bray intervened (Doc. 72) on December 3,

2007.  Bray (along with Odyssey and the Kingdom of Spain) later concluded that the

vessel is not the *Merchant Royal*, which remains undiscovered.  Bray amends

(Doc. 214) his intervenor's complaint and sues for "fraud in the inducement,"

"rescission," "mutual mistake," and declaratory judgment.  In sum, Bray seeks a

declaratory judgment of his contractual rights upon the hypothetical discovery of the

*Merchant Royal*.  Odyssey moves (Doc. 215) to dismiss.

## ALLEGATIONS OF THE AMENDED COMPLAINT (DOC. 214)

A citizen of the United Kingdom, Keith Bray researches shipwrecks.  In an

effort to locate the wreck of the *Merchant Royal*, Bray invested "considerable" time,

money, and effort in "reviewing records of antiquity, visiting foreign countries, and

translating historical works."  During a trip to Paris, Bray met Greg Stemm, the co-

chairman of Odyssey, who orally agreed that in exchange for Bray's research

Odyssey would upon discovery of the lost vessel pay Bray 7.5% of the recovery value.

After the Paris agreement but before the discovery of the wreck, Stemm

"represented to [Bray] that there was either some legal, institutional, or corporate

reason why Odyssey must back out of" the Paris agreement.  Additionally, Stemm

"represented" that Odyssey had neither used Bray's research nor searched for the *Merchant Royal* and that Odyssey "had no plans to do so." Thus, "in lieu of" the Paris oral agreement, Bray accepted a cash payment, which was confirmed in writing. The written confirmation states that in exchange for the previous research, Odyssey paid Bray £1,500 and agreed to pay an additional £9,500.[1] (Doc. 215, ¶¶ 1–3)

Later, using Bray's research, Odyssey found a wreck "within the expected area projected by Bray." After testing cargo found at the site, Odyssey concluded that the wreck was not the *Merchant Royal* and abandoned the site.

Bray alleges that Stemm's "representations" fraudulently induced the written contract and Bray's acceptance of the cash payment. In the alternative, Bray alleges that Stemm's and his "mistaken belief that Odyssey could not perform under the Paris agreement" caused the parties to enter the written agreement by mutual mistake. Bray seeks rescission of the written contract, a reimbursement of Bray's $20,000 "research cost," and a declaration "reinstating" the Paris oral agreement and awarding Bray "the legal right to the [7.5%] share even before the vessel is located."

---

[1] Odyssey attaches the written agreement. (Doc. 215-1) Central to the claim and undisputed, the written agreement is properly considered on a motion to dismiss. *Day v. Taylor*, 400 F.3d 1272, 1275–16 (11th Cir. 2005).

# DISCUSSION

Ultimately, Bray seeks an authoritative declaration rescinding the written agreement and construing the Paris agreement.  Instead of limiting the complaint to a claim for a declaratory judgment, Bray collaterally alleges "fraud in the inducement," "rescission," and "mutual mistake," none of which is necessary, cogent, or, ultimately, sufficient to state a claim.

First, as noted in an August 18, 2010, order (Doc. 185), neither "rescission" nor "mutual mistake" constitutes a "claim" upon which a plaintiff may sue.  Mutual mistake is an avoidance.  Rescission is a remedy.  The Table of Contents of a pre-eminent contracts treatise captures the idea—"Chapter 70.  Reformation and Rescission for Mistake."  *Williston on Contracts* (4th ed. 2011).  Nonetheless, because "Florida's courts have muddied the waters by confusing the law of remedies with underlying causes of action, a claim [of] 'rescission' is well recognized under Florida law."  *Ahem Fidelity Nat. Title Ins. Co.*, 664 F. Supp. 2d 1224, 1229 (M.D. Fla. 2009) (Presnell, J.).  "Rescission" requires a plaintiff to allege:

    (1)  The character or relationship of the parties;

    (2)  The making of the contract;

    (3)  The existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation;

(4) That the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission.

(5) If the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible.

(6) Lastly, that the moving party has no adequate remedy at law.

*Ahem*, 664 F. Supp. 2d at 1229 (quoting *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. 2d DCA 1965)).  The written agreement (Doc. 215-1) confirms that, in exchange for Bray's research, Odyssey paid Bray £1,500 and agreed to pay an additional £9,500.  (Doc. 215, ¶¶ 1–3)  Absent an allegation of a previous offer by Bray to restore to Odyssey either £1,500 or £11,000 (whichever Bray ultimately received), the amended complaint fails to state a claim of "rescission."

Second, "fraud in the inducement" requires a resulting injury.  *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 742 (11th Cir. 1995).  Bray alleges that Odyssey's "misrepresentations" caused him to enter the written agreement, which caused damages of $20,000, an amount calculated by Bray's alleged "research costs."  (¶ 30).  In light of the other alleged facts, the allegation of damages lacks both plausibility and coherence.  As alleged, the written agreement was simply a modification of the Paris agreement.  The research was complete at the time of the Paris agreement, long before the written agreement.  In Paris, Bray allegedly gave the

research to Odyssey in exchange for 7.5% of the prospective treasure.  Consequently,

the written agreement replaced a 7.5% share of the salvage with £11,000 and

therefore changed only the consideration due to Bray.[2]  The written agreement was

simply a modification and produced no legal detriment to Bray.  Instead, Bray

received £11,000, which is £11,000 more than he would have received under the

Paris agreement.  Suffering no injury to date (and ahead £11,000), Bray fails to state a

claim for fraud in the inducement.  The claims for "rescission," "mutual mistake,"

and "fraudulent inducement" are dismissed.  Only the declaratory judgment count

remains.

*   *   *

If federal jurisdiction appears doubtful, a *sua sponte* inquiry is required.

*Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1542 (11th Cir. 1993) (citing cases).

Preventing an advisory opinion, Article III of the United States Constitution limits

---

[2] Consistent with Bray's allegations, paragraphs one and five of the written agreement
(Doc. 215-1) confirm Odyssey's possession of the research before the written agreement:

> Bray has provided Odyssey with a file of information relative to the shipwreck
> of the Merchant Royal, a ship lost in the English Channel in 1641. . . .  Bray and
> Odyssey warrant that no agreement for additional research on the Merchant
> Royal, or on any other shipwreck, written or verbal, exists between Bray and
> Odyssey at present.  This agreement only covers research work already
> provided. . . . Bray may provided additional research activities on behalf of
> Odyssey, provided his services may be terminated at any time.  Any other
> services to be provided will be subject to separate agreement for compensation
> as mutually agreed by Bray and Odyssey.

the exercise of federal judicial power to a "case or controversy." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937). "The case or controversy requirement must be met throughout the entirety of the proceeding[]." *ACLU v. The Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests'" and must "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins.*, 300 U.S. at 240-41; *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985) (noting that a continuing controversy "may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than a speculative threat of future injury").

A comparison of *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), and *Atlanta Gas Light v. Aetna Casualty and Surety Co.*, 68 F.3d 409 (11th Cir. 1995), exhibits the range of controversies presenting a "case in controversy" suitable for declaratory judgment. In *MedImmune*, the plaintiff, a drug manufacturer, entered a patent license agreement with the patent licensor. When the licensor asserted that one of the licensor's patents covered one of the manufacturer's drugs, the manufacturer decided to pay royalties "under protest" rather than risk treble damages and attorneys' fees for infringement. The manufacturer disputed the drug's infringement and the patent's validity. While paying royalties "under protest," the

- 7 -

manufacturer sued for a declaratory judgment. Reasoning that the manufacturer's decision to continue paying royalties prevented a "reasonable apprehension of imminent litigation," the district court dismissed, and the appellate court affirmed.

The Supreme Court reversed; rejected the conclusion that the manufacturer needed to risk treble damages, attorneys' fees, and an injunction from a breach of contract before filing suit; and stated, "[B]ut for [the manufacturer's] continuing to make royalty payments, nothing about the dispute would render it unfit for judicial resolution." *MedImmune*, 549 U.S. at 128. Thus, because the threat of harm to the manufacturer was "real" and "imminent," the manufacturer alleged a "case or controversy" under Article III and an "actual controversy" under the Declaratory Judgment Statute, 28 U.S.C. § 2201.[3]

On the other hand, the plaintiff in *Atlanta Gas Light v. Aetna Casualty and Surety Co.*, 68 F.3d 409 (11th Cir. 1995), established no case or controversy. During the

---

[3] Requiring an "actual controversy," the Declaratory Judgment Act, 28 U.S.C. § 2201, echoes the Article III "case or controversy" requirement. *Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir. 1985); *Malowney v. Fed. Collection Deposit Group*, 193 F.3d 1342, 1347 (11th Cir. 1999) ("Consistent with the 'cases and controversies' requirement of Article III, the Declaratory Judgment Act . . . specifically provides that a declaratory judgment may be issued only in the case of an 'actual controversy.'"); *Prasco v. Medicis Pharmaceutical Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008) ("The Declaratory Judgment Act's requirement of 'a case of actual controversy' simply affirms this Constitutional requirement, having long been interpreted as referring to any . . . controversy that is justiciable under Article III."); *Teva Pharmaceuticals USA v. Novartis Pharmaceuticals Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007) ("[A] declaratory judgment plaintiff is only required to satisfy Article III . . . to warrant the issuance of a declaratory judgment." (internal quotation omitted)); *Wright & Miller et al.*, 10B *Federal Practice & Procedure* § 2757 (3d ed. 2011) (noting the identical constitutional and statutory requirement).

early twentieth century, the plaintiff operated twelve manufactured gas plants, which

the plaintiff razed or dismantled long before the commencement of an EPA

investigation in the 1980's.  In 1990, the EPA "revised the 'toxicity characteristics'

used to identify hazardous wastes."  *Atlanta Gas*, 68 F.3d at 412.  The revision

subjected the plaintiff's plants to further scrutiny by the EPA.  Later in 1990, the

Florida Department of Environmental Regulation assessed the plaintiff's former

Sanford, Florida, plant and recommended "additional screening" of both the Sanford

plant and many other former manufactured gas plants never owned or operated by

the plaintiff.  In response to each investigation, the plaintiff notified twenty-three

insurers of potential liability for the cost of clean-up at former gas plants.  The next

day, the plaintiff sued for a declaratory judgment "to determine the extent of its

insurers' liability for environmental cleanup costs."  *Atlanta Gas*, 68 F.3d at 411.

However, no government agency or individual had filed a claim or a lawsuit against

the plaintiff, and none of the twenty-three insurer's either responded to the notice or

refused coverage.  Thus, the plaintiff presented issues that "were no more than

conjectural questions based on the fact that other utilities had battled with insurers

over [] clean[-]up costs."  *Atlanta Gas*, 68 F.3d at 415.  Because the plaintiff "filed its

complaint as an anticipatory maneuver designed to pre[-]empt whatever actions the

insurers may have taken after they received [the plaintiff's] notice," the plaintiff

"could claim neither actual nor threatened injury resulting from the insurers'

- 9 -

conduct, nor any injury traceable to the insurance companies at all." *Atlanta Gas*, 68 F.3d at 415.

In sum, Bray must show an actual or threatened injury "of sufficient immediacy and reality" that "is likely to be redressed by a favorable court disposition." *Atlanta Gas*, 68 F.3d at 414; *accord MedImmune,* 549 U.S. at 127 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Absent a threat of an immediate injury or harm, "[n]o controversy exists when a declaratory judgment plaintiff attempts to obtain a premature ruling . . . typically adjudicated in a future actual controversy." *MedImmun*e, 549 U.S. at 139 (Thomas, J. dissenting) (citing *Coffman v. Breeze Corps.*, 323 U.S. 316, 324 (1945) ("The declaratory judgment procedure . . . may not be made the medium for securing an advisory opinion in a controversy which has not arisen.")).

Causing confusion throughout this action, Bray awkwardly packages a breach of contract action as a request for a declaratory judgment. In essence, Bray seeks an authoritative declaration recognizing the Paris agreement and invalidating the written agreement for either fraud or mutual mistake. The requested relief is available by awaiting the contingency of the *Merchant Royal*'s discovery by Odyssey and, if and when the discovery occurs, by timely asserting a breach of the Paris agreement. For example, if Odyssey finds and salvages the *Merchant Royal*, if Bray demands a 7.5% share of the salvage, and if Odyssey refuses the demand, Bray could

- 10 -

assert an unquestionably justiciable action for breach of the Paris agreement.

Odyssey might defend by arguing that the parties entered no oral agreement in Paris

and by citing the written agreement and raising either release or modification as an

affirmative defense. Bray might respond that Odyssey fraudulently induced the

written agreement or that the parties entered the written agreement based on a

mutual mistake. Instead, similar to the plaintiff in *Atlanta Gas*, Bray seeks a

premature and hypothetical declaratory judgment to pre-empt Odyssey's contingent

defense in Bray's contingent lawsuit to establish Bray's contingent entitlement to a

7.5% share in the event of the contingent salvage of the *Merchant Royal*.

   A declaratory judgment must effect some immediate or imminent "change" or

redress some immediate or imminent injury. *Erwin Chemerinsky, Federal Jurisdiction*

§ 2.2 (5th ed. 2007) ("[F]ederal courts can issue declaratory judgments if there is an

actual dispute between adverse litigants and if there is a substantial likelihood that a

favorable federal court decision will bring about some change."); *see also Rock Energy

Co-op. v. Village of Rocktown*, 614 F.3d 745, 748 (7th Cir. 2010) (noting that Article III

bars a plaintiff from "asserting an injury that 'depend[s] on so many future events

that a judicial opinion would be advice about remote contingencies'" (quoting

*Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 538 (7th Cir. 2006))).

   Unlike *MedImmune*, a dismissal of this action without prejudice exposes Bray

to no threatened or immediate injury or even consequential uncertainty. Bray need

not choose between this lawsuit and some "real and immediate" harm, and Bray

suffers no hardship from the present denial of review. *Poe v. Ullman*, 367 U.S. 497,

508–09 (1961) (establishing "hardship to the parties" as a consideration of ripeness).

As explained in a February 3, 2012, order to show cause (Doc. 222), an immediate

decision on the merits appears both gratuitous and advisory:

> Neither a ruling in favor of Bray nor a ruling in favor of Odyssey
> appears to redress an injury "of sufficient immediacy and reality." The
> *Merchant Royal*, her whereabouts unknown, rests undetected,
> unrecovered, and unsalvaged somewhere on the bottom of the ocean.  A
> ruling in favor of Bray might void the written agreement, might
> recognize the alleged oral agreement, and might entitle Bray to the
> prospect of a 7.5% share of the *Merchant Royal*'s contingent and
> hypothetical salvage.  A ruling in favor of Odyssey might affirm the
> written agreement, the performance of which the parties competed years
> ago . . . .  Thus, no real or imminent injury appears to occur pending the
> remote and uncertain eventuality that Odyssey locates, recovers, and
> salvages the *Merchant Royal* (and refuses Bray's demand for a 7.5%
> share).  Effecting no immediate or even foreseeable "change," a ruling
> at this juncture appears to create a mere advisory opinion.

On the belief that the "unidentified shipwrecked vessel" was the *Merchant*

*Royal*, Bray intervened in this action.  The belief possibly created for Bray an

"immediate" threatened injury—that Odyssey would salvage the *Merchant Royal* and

refuse to pay the 7.5% allegedly owed under the Paris agreement.  As the amended

complaint concedes, the unidentified shipwrecked vessel is not the *Merchant Royal*,

which remains undiscovered.  Thus, Bray seeks a present determination of his

contractual rights so he may recover money upon the happening of a remote

contingency—that a particular salvage company discovers sunken treasure buried undisturbed since 1641 somewhere on the bottom of the North Atlantic.

In *Stewart v. M.M. & P. Pension*, 608 F.2d 776 (9th Cir. 1979), an employee sued the trustee of a pension plan to determine an entitlement to enhanced pension benefits available upon retirement.  A fifty-eight-year-old active employee, the plaintiff identified no immediate plan to retire, and the Ninth Circuit dismissed for lack of a case or controversy.  Compare the possibility of a fifty-eight-year-old's retirement to the possibility of a successful treasure find:

> No one is denying any benefit now to [the plaintiff], nor is anyone in any way presently causing him any injury.  The past and present Trustees have simply said that if, as, and when he does retire, they propose to apply [a reduced benefit].
>
> . . .
>
> [F]or a case or controversy in the constitutional sense, there must be an issue which is not remote and hypothetical but which is real and present. The problem submitted to the court below was not a case or controversy in the constitutional sense.  In essence, what [the plaintiff] sought was an advisory opinion for possible use in the future when, as, and if he retires for the second time.

In response to the February 3, 2012, order to show cause, Bray attempts to establish a present injury because a "re-instatement" of the Paris agreement permits a sale of the contractual interest to an "investor."  Bray submits as evidence only his August, 2010, affidavit, which states abstractly that he "could have sold a percentage of [] shares for well in excess of $75,000." (Doc. 227-1, ¶ 14)

When a plaintiff must submit evidence to establish a case or controversy, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), requires the submission of a "concrete plan." The *Lujan* plaintiffs challenged a regulation providing that the Endangered Species Act excludes overseas government activity. The plaintiffs claimed that the regulation increased the rate of extinction of overseas endangered species. Although the plaintiffs on summary judgment submitted detailed affidavits describing past trips and past sightings of endangered animals and claiming an intent to return to the affected area, the action failed to state a "case or controversy" because "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564. Bray argues that, "given Odyssey's expertise, it is neither 'remote' nor an 'uncertain eventuality' that Odyssey has or will locate, recover[,] and salvage the *Merchant Royal*." (Doc. 227 at 7) Granted, Odyssey has the capability to salvage a valuable, ancient shipwreck,[4] but a mere and remote possibility fails to trigger a sufficiently "immediate" or "real" controversy. *See, e.g.*, *Golden v. Zwickler*, 394 U.S. 103 (1969) (finding no justiciability with the mere possibility that a congressman-

---

[4] *See Odyssey Marine Exploration, Inc. v. Unidentified, Shipwrecked Vessel*, 675 F. Supp. 2d 1126 (M.D. Fla. 2009), *affirmed* 657 F.3d 1159 (11th Cir. 2011), *cert denied* ___ S. Ct. ___, 2012 WL 645048 (May 14, 2012) (determining claims to $600 million in silver from the *Nuestra Señora de las Mercedes*, an 1804 Spanish wreck discovered by Odyssey in 2007).

turned-judge might again campaign for Congress). And Bray neither identifies nor proves a prospective buyer, a contract for sale, an offer for sale, a recognized market for sale, or even a method of appraisal. Even if a present inability to sell an interest constitutes a constitutionally recognized "harm," Bray's failure to submit evidence of either a potential offer or buyer or market renders the "harm" neither "actual" nor "imminent." Bray's evidence establishes no "case or controversy."

Finally, Bray argues that earlier in this action, the Eleventh Circuit "specifically held that 'Bray has brought a proper federal claim.'" (Doc. 227 at 6) (quoting *Odyssey Marine Exploration, Inc. v. Unidentified, Shipwrecked Vessel*, 636 F.3d 1338, 1340 (11th Cir. 2011)). However, the appeal and the opinion concerned only whether Bray invoked under 28 U.S.C. § 1333 the maritime jurisdiction of the federal courts. Claiming to taste a "salty flavor," the Eleventh Circuit found jurisdiction under Section 1333 but issued no ruling on Article III. *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel or Vessels*, 636 F.3d 1338, 1340 (11th Cir. 2011). A doubt about the existence of federal jurisdiction obliges a *sua sponte* inquiry, and Bray must satisfy the "case or controversy" requirement throughout the litigation. Bray fails.

# A FINAL NOTE

I hesitate to terminate this action for a second time without yet reaching the merits, but:

In *Klos v. Paulson, Sec. of the Treasury*, 8:08-cv-843, Middle District of Florida, the plaintiff, an "exhibitor of rare historical U.S. Presidential manuscripts," alleged in his complaint the U.S. Mint's failure to produce under the "Presidential Coin Act of 2005," 31 U.S.C. § 5112(n), a coin commemorating each of the "chief executives" who served before 1789 under the Articles of Confederation created a disbelief among the citizenry that these persons (Samuel Huntington, Richard Henry Lee, John Hancock, and others – an admittedly noble corps) qualified as a "president of the United States." Klos alleged that the U.S. Mint's failure to produce the coins and the consequent public disbelief interferes with his exhibiting the "presidential" manuscripts of the excluded persons.

Because 31 U.S.C. § 5112(n)(3)(A) explicitly directs the U.S. Mint to produce a coin to commemorate only the presidents "beginning with President George Washington," I dismissed Klos's utterly meritless claim with prejudice. In a footnote in the order (Doc. 14 at 2, n.2), I addressed the plaintiff's standing:

> Although the plaintiff's claim of standing sue (Doc. 1 at ¶ 11) appears actually doubtful, '[at] the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those

specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 561 (1962).

The United States had not discussed in the district court Klos's standing to sue but, prompted by my footnote two, above, raised the question on appeal. Overlooking my mention in footnote two of Klos's dubious standing, the circuit court in *Klos v. Paulson*, 309 Fed. Appx. 322 (11th Cir. 2009), noted at footnote one:

> Because standing is a jurisdictional requirement we must address *sua sponte*, the government's failure to raise the standing issue in the district court does not impede our ability to consider the issue for the first time on appeal.

The circuit court concluded:

> We agree with the government that the allegations in Klos's complaint, taken as true, do not establish Article III standing.  *See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F. 3d 1229, 1232 (11th Cir. 2008) (explaining that plaintiff's complaint must allege, *inter alia*, "an injury in fact – a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical" to establish Article III standing).

The circuit court vacated and remanded, not for consideration by the district court of the standing question but with instructions to dismiss Klos's claim without prejudice (thereby preserving for another day Klos's claim for the minting of, for example, the Samuel Huntington presidential commemorative one dollar coin).

In *Klos*, the circuit court insisted compellingly that the issue of standing receive pre-emptive priority, despite the comparative ease and clarity of an alternative basis for decision (and certainly before the conduct of a trial).  In this instance and in

accord with *Klos*, the issue of whether Bray's remote, hypothetical, and elusory claim presents a presently justiciable issue demands the same pre-emptive consideration.

## CONCLUSION

The motion to dismiss (Doc. 215) is **GRANTED**.  The claims of "rescission," "mutual mistake," and fraudulent inducement are **DISMISSED WITH PREJUDICE**.  With the dismissal of the three purported claims for relief, the sole declaratory judgment count fails to establish an Article III "case or controversy." Accordingly, this action is **DISMISSED WITHOUT PREJUDICE**.  The clerk is instructed to (1) terminate any pending motion and (2) close the case.

ORDERED in Tampa, Florida, on August 15, 2012.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE